# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAYSCALE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0118-BWD |
| | ) | |
| ERIN NORMAN and BETTERCOMP, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
## GRANTING MOTION TO DISMISS

Date Submitted: May 27, 2025
Date Decided: June 9, 2025

Steven L. Caponi, Megan E. Hunt, K&L GATES LLP, Wilmington, DE; OF COUNSEL: Kathleen D. Parker, K&L GATES LLP, Boston, MA; *Attorneys for Plaintiff Payscale Inc.*

John A. Sensing, Jesse L. Noa, Tyler E. Cragg, Hannah L. Paxton, POTTER ANDERSON & CORROON LLP, Wilmington, DE; *Attorneys for Defendants Erin Norman and BetterComp, Inc.*

**DAVID, V.C.**

The plaintiff in this action, Payscale Inc. ("Payscale"), has sued a former employee and her new employer to enforce restrictive covenants, including a noncompete, contained in two incentive equity agreements the employee signed while working at Payscale. Payscale also brings claims for breach of nonsolicitation and confidentiality provisions in the same agreements, as well as tortious interference with contractual relations and tortious interference with prospective business relations. This memorandum opinion concludes that the noncompete is unreasonable in scope, rendering it unenforceable, and that the remaining counts fail to state a claim upon which relief may be granted.

## I.    BACKGROUND

Unless otherwise noted, the following facts are taken from Payscale's Amended Verified Complaint (the "Amended Complaint") and the documents it incorporates by reference. Am. Verified Compl. [hereinafter "Am. Compl."], Dkt. 26.

### A.    Payscale Hires Norman As Its Director Of Sales.

Payscale is a Washington corporation that provides compensation data, software, and services throughout the United States. Am. Compl. ¶¶ 13, 15, 32. On November 29, 2021, defendant Erin Norman ("Norman") began working for Payscale as Director of Sales, reporting to Payscale's Senior Vice President of Sales. *Id.* ¶ 45; *id.*, Ex. 4.

1

**B.** **Topco And Norman Enter Into The First Incentive Equity Agreement.**

Non-party Sonic Topco, L.P. ("Topco") is a Delaware limited partnership that serves as the parent holding company for Payscale and Payscale's subsidiaries. Am. Compl. ¶ 14; *id.*, Ex. 3.

On March 14, 2022, Topco and Norman entered into an incentive equity agreement (the "First Incentive Equity Agreement") under which Norman was to receive 150,000 Topco "Profit Interest Units" in the form of "Service Units" and "Performance Units." *Id.*, Ex. 1 [hereinafter First Agt.] §§ 1, 4(a). Under the First Incentive Equity Agreement, Norman was to receive 25% of the Service Units on February 23, 2023; the remaining 75% of the Service Units over the next three years; and the Performance Units only upon a sale of Topco. *Id.* § 4(b). The fair market value of the Profit Interest Units when Norman received them was $0.00, and they cannot be transferred or sold unless Topco is sold or agrees to repurchase them. *Id.* §§ 5–6, 15.

The First Incentive Equity Agreement includes restrictive covenants (the "Restrictive Covenants"), including a covenant not to compete (the "Noncompete"), a nonsolicitation covenant (the "Nonsolicitation Provision"), and confidentiality obligations (the "Confidentiality Provision"). *Id.* §§ 7–8. Section 8(e) of the First Incentive Equity Agreement (the "Cancellation Provision") states that if Norman

2

breaches the Restrictive Covenants, her Profit Interest Units "shall automatically be cancelled without payment of any consideration":

> Notwithstanding anything to the contrary herein, if it is determined following [Norman]'s Separation that [Norman] has breached any of the covenants in Section 7 or Section 8, in addition to the other remedies provided herein, (i) [Topco] shall be permitted to retroactively treat [Norman]'s prior Separation as though [Norman] had been terminated for Cause for purposes of this Agreement, (ii) **all Profits Interest Units** (whether held by [Norman] or one or more of [Norman]'s Transferees . . . **shall automatically be cancelled without payment of any consideration** and (iii) [Norman] shall pay to [Topco] (and/or the Investor Partners to the extent they exercised the Repurchase Option) the amount (if any) received by [Norman] (or any of [Norman]'s transferees) in consideration for the Profits Interest Units pursuant to the Repurchase Option; provided that the foregoing is not an election of remedies by [Topco] and [Topco]'s remedies are cumulative and is entitled to both forfeiture of the Profits Interest Units and actual damages.

*Id.* § 8(e) (emphasis added).

The Noncompete provides that, for eighteen months following Norman's separation from Payscale (the "Protection Period"), Norman "shall not engage in a Competitive Activity," *id.* § 8(a), defined as follows:

> [W]ith respect to [Norman], directly or indirectly, whether as principal, agent, partner, officer, director, stockholder, employee, consultant or otherwise, alone or in association with any other Person or entity, **own, manage, operate, control, participate in, render services for, or in any other manner engage in, anywhere in the United States, any Competitive Business** other than for or on behalf of [Topco] or any Subsidiary of [Topco]; provided that nothing herein shall prohibit [Norman] from

(a) owning a passive interest of up to 2% of any class of securities of any corporation that is traded on a national securities exchange or

(b) being employed or engaged by an entity where such work (i) would not involve any level of strategic, advisory, technical, creative, or sales activity or (ii) is exclusively in connection with an independent business line of such entity that is wholly unrelated to the business operated by the Partnership Group and the Confidential Information.

*Id.* § 9 (emphasis added). "Competitive Business" is defined to include "any business conducted by [Topco] or any of its Subsidiaries as of [Norman]'s Separation Date or any business proposed to be conducted by [Topco] or any of its Subsidiaries as evidenced by a written business plan in effect prior to [Norman]'s Separation Date." *Id.* The "Partnership Group" includes Topco and its direct and indirect subsidiaries, although Payscale is Topco's "only direct or indirect subsidiary . . . that is an operating entity." *Id.*; Am. Compl. ¶ 69.

The Nonsolicitation Provision provides that during the Protection Period, Norman shall not:

(i) induce or attempt to *induce any employee, advisor or independent contractor* of any member of the Partnership Group *to leave the employ or engagement of the Partnership Group*, or in any way interfere with the relationship between any member of the Partnership Group and any of their respective employees, advisors or independent contractors, or

(ii) induce or attempt to *induce any client, customer, supplier, vendor, licensor, lessor or other business relation* of any member of the Partnership Group (or any prospective client, customer, supplier, vendor, licensor, lessor or other business relation with which any member of the Partnership Group has entertained discussions regarding a prospective business relationship) *to cease or refrain from doing*

4

***business with any member of the Partnership Group***, or in any way interfere with the relationship (or prospective relationship) between any such client, customer, supplier, vendor, licensor, lessor or other business relation and any member of the Partnership Group . . . .

First Agt. § 8(b) (emphasis added).

### C. Payscale Promotes Norman To Senior Director Of Sales.

On February 26, 2023, Norman was promoted to Senior Director of Sales, overseeing Payscale's "Enterprise Sales teams" for the "West region."[1] Am. Compl. ¶¶ 47–48; *id.*, Ex. 5. In that role, Norman supervised seventeen individuals and reported to the Senior Vice President of Revenue, the head of Payscale's sales division who, in turn, reports to the Chief Operating Officer. Am. Compl. ¶¶ 48–49.

### D. Topco And Norman Enter Into The Second Incentive Equity Agreement.

On August 14, 2023, Topco and Norman entered into another incentive equity agreement (the "Second Incentive Equity Agreement," and with the First Incentive Equity Agreement, the "Incentive Equity Agreements"), under which Norman was

---

[1] Payscale divides its customers into "East" and "West" regions, based on where the customers are headquartered. Am. Compl. ¶ 37. The West region included Alaska, Arizona, Arkansas, California, Colorado, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wisconsin, Wyoming, and certain Canadian provinces. *Id.* ¶ 38. "During Norman's employment at Payscale, Enterprise customers were entities with over 1,200 employees." *Id.* ¶ 35.

5

to receive an additional 25,000 Profit Interest Units. Am. Compl., Ex. 2 [hereinafter Second Agt.]. The Second Incentive Equity Agreement contains the same Restrictive Covenants and Cancellation Provision as the First Incentive Equity Agreement. *Compare* First Agt. §§ 7–8 *with* Second Agt. §§ 7–8.

### E. Norman Leaves Payscale And Joins Korn Ferry, Then BetterComp.

On December 1, 2023, Norman resigned from Payscale. Am. Compl. ¶ 77. Later that month, she accepted a position as a Client Director at Korn Ferry, a global organizational consulting firm. *Id.* ¶ 80. Payscale did not seek to enforce the Restrictive Covenants at that time. Defs.' Opening Br. in Supp. of Mot. to Dismiss Am. Compl. [hereinafter OB] at 9, Dkt. 29.

Ten months later, in October 2024, Norman updated her LinkedIn profile to reflect that she had left her position at Korn Ferry to work for defendant BetterComp, Inc. ("BetterComp," and with Norman, "Defendants"), a California "compensation market pricing software company and direct competitor of Payscale." Am. Compl. ¶¶ 6, 17, 82–83. On November 22, 2024, Payscale informed Norman that she was in breach of the Restrictive Covenants. *Id.* ¶ 98.

### F. Procedural History

On January 31, 2025, Payscale initiated this action through the filing of a Verified Complaint, seeking to enforce the Restrictive Covenants. Verified Compl., Dkt. 1. Payscale moved for expedition and a temporary restraining order. *Id.* At a

February 13 hearing, the Court granted expedition but denied Payscale's request for temporary injunctive relief. *See* Dkt. 17.

On March 14, Payscale filed the operative Amended Complaint. Dkt. 26. On March 21, Defendants moved to dismiss the Amended Complaint (the "Motion to Dismiss").[2] The Court heard oral argument on May 27. Dkt. 51.

### G. The Protection Period Expires.

The Protection Period expired on June 1, 2025. Am. Compl. ¶ 78. However, Section 8(d) of the Incentive Equity Agreements states that "the Protection Period will be extended for a period of time equal to the time period" that Norman breached the Restrictive Covenants, "such that [Norman] is ultimately foreclosed from engaging in the activities set forth in this Section 8 for a time period equal to the Protection Period." First Agt. § 8(d); Second Agt. § 8(d).

## II. ANALYSIS

Defendants have moved to dismiss the Amended Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted. When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true, (2) accept even vague

---

[2] On March 28, Payscale filed its Answering Brief in Opposition to the Motion to Dismiss. Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss Am. Compl. [hereinafter AB], Dkt. 36. Defendants filed their Reply Brief in Further Support of the Motion to Dismiss on April 4. Reply Br. in Supp. of the Mot. to Dismiss Am. Compl. [hereinafter RB], Dkt. 44.

7

allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

The Amended Complaint brings three counts: Count I alleges a claim against Norman for breach of the Restrictive Covenants in the Incentive Equity Agreements; Count II alleges a claim against BetterComp for tortious interference with contractual relations; and Count III alleges a claim against Norman and BetterComp for tortious interference with prospective business relations. Am. Compl. ¶¶ 138–66. For the reasons that follow, all three counts are dismissed.

## A. Count I Is Dismissed.

In Count I of the Amended Complaint, Payscale alleges a claim against Norman for breach of the Restrictive Covenants in the Incentive Equity Agreements. *Id.* ¶¶ 138–48. Defendants raise several arguments in support of dismissal, including that (1) the Incentive Equity Agreements are not binding because they were not supported by valid consideration; (2) Payscale is not a third-party beneficiary of the Incentive Equity Agreements and therefore lacks standing to enforce the Restrictive Covenants; (3) the Restrictive Covenants are unreasonable in scope, rendering them unenforceable; and (4) the Amended Complaint fails to adequately allege that

8

Norman has breached the Nonsolicitation or Confidentiality Provision. The following analysis focuses on Defendants' third and fourth bases for dismissal.

**1.    The Noncompete Is Unenforceable.**

"Delaware courts do not 'mechanically' enforce non-competes." *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020) (quoting *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987)). Instead, "agreements not to compete must be closely scrutinized as restrictive of trade." *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977). A noncompete is enforceable only when it "(1) [is] reasonable in geographic scope and temporal duration, (2) advance[s] a legitimate economic interest of the party seeking its enforcement, and (3) survive[s] a balancing of the equities." *FP UC Hldgs.*, 2020 WL 1492783, at *6 (quoting *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018)). "To determine the reasonableness of the Non-Compete, the Court must read the contractual language as a whole, in the context of the employment relationship." *Hub Gp., Inc. v. Knoll*, 2024 WL 3453863, at *8 (Del. Ch. July 18, 2024).

Under the Noncompete, for eighteen months following her separation from Payscale, Norman "shall not engage in a Competitive Activity," meaning she cannot "own, manage, operate, control, participate in, render services for, or in any other manner engage in, anywhere in the United States, any Competitive Business" for

9

anyone but Topco or its subsidiaries, where "Competitive Business" includes "any business conducted by [Topco] or any of its Subsidiaries as of [Norman]'s Separation Date or any business proposed to be conducted by [Topco] or any of its Subsidiaries as evidenced by a written business plan in effect prior to [Norman]'s Separation Date." First Agt. §§ 8(a), 9; Second Agt. §§ 8(a), 9. In other words, for an eighteen-month period, Norman is prohibited from working anywhere in the country, in almost any role, for any company engaged in business that Topco or its subsidiaries were conducting or had proposed to conduct as of Norman's departure.

### a. The Noncompete Is Overbroad In Geographic And Temporal Scope.

Defendants argue that the Noncompete is overbroad in geographic and temporal scope, and that it exceeds Payscale's legitimate business interests. Beginning with geography and duration, this Court has explained that:

> The[se] two dimensions necessarily interact. To be barred for five years from working in a single county leaves open opportunities for the former employee in surrounding areas. To be barred from an entire state for a shorter period, such as a year or less, leaves open the possibility that the former employee could live off savings, take a long vacation, or enjoy some garden leave. All else equal, a longer restrictive covenant will be more reasonable if geographically tempered, and a restrictive covenant covering a broader area will be more reasonable if temporally tailored.

*Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011).

The Noncompete here is eighteen months in duration—not unreasonable in isolation—but nationwide in geographic scope. "[T]his court has enforced non-

10

competes with a nationwide scope, but only in instances where the competing party agrees, in connection with the sale of a business, to stand down from competing in the relevant industry . . . anywhere . . . for a stated period of time after the sale." *FP UC Hldgs.*, 2020 WL 1492783, at \*7. "These broader restrictions make sense following the sale of a business" because "[t]he buyer has just paid handsomely for the business and the broad non-compete clears the seller from the competitive space while the buyer strives to make the business he just bought successful." *Id.* But where, as here, an employer provides an employee only minimal consideration to secure a noncompete, this Court has found a nationwide scope overbroad. *See, e.g.*, *Centurion Serv. Gp., LLC v. Wilensky*, 2023 WL 5624156, at \*5 (Del. Ch. Aug. 31, 2023) (finding the nationwide scope of a noncompete overbroad, noting the consideration received was minimal where the employee agreed to the noncompete "when he was already employed by [the employer]"); *FP UC Hldgs.*, 2020 WL 1492783, at \*7 (finding the nationwide scope of a noncompete overbroad where the employee did not receive "substantial consideration in exchange for his commitment not to work in [the employer]'s industry anywhere in the United States").[3]

---

[3] Payscale relies on *Lyons Insurance Agency, Inc. v. Wilson*, 2018 WL 4677606 (Del. Ch. Sept. 28, 2018), where the Court concluded that a noncompete without an "express geographic limitation" was enforceable. Importantly, however, the Court in that case *denied* the plaintiff's request for injunctive relief in favor of a liquidated damages clause.

Defendants argue that the consideration exchanged for the Noncompete here is not just minimal, but illusory, such that no enforceable contract was formed. They rely on this Court's recent decision in *North American Fire Ultimate Holdings, LP v. Doorly*, 2025 WL 736624 (Del. Ch. Mar. 7, 2025), where an employee executed a contract under which he was to receive incentive units "subject to time and performance vesting." *Id.* at *1. The contract included restrictive covenants, and stated that if the employee breached those covenants, his vested and unvested units would be "automatically forfeited." *Id.* The employer later sued to enforce the restrictive covenants, and the Court dismissed the complaint, finding that when the employer "declared that [the employee] forfeited the Units" by breaching the restrictive covenants, the employer "eliminated the sole consideration for the restrictive covenants." *Id.* at *3.

Defendants contend that, as in *Doorly*, the only consideration Norman received in exchange for the Restrictive Covenants—nontransferable Profit Interest Units with no value at the time of issuance—was "automatically cancelled" upon her purported breach, "eliminat[ing] the sole consideration for the restrictive covenants." *Id.*; OB at 20. I need not go so far as to conclude that Norman received

*no* consideration in exchange for the Noncompete, however.[4]  Assuming the Profit Interest Units had *some* value when the parties executed the Incentive Equity Agreements, it nevertheless is not reasonably conceivable that the consideration exchanged—vanishingly small compared to that received for the sale of a business— could support an eighteen-month, nationwide prohibition on work in almost any role for any company engaged in business that Topco or its subsidiaries were conducting, or had even proposed to conduct, as of Norman's departure.[5]

---

[4] Payscale seeks to distinguish *Doorly* on the basis that the Incentive Equity Agreements here were "executed in connection with [Norman]'s hiring and promotion."  Am. Compl. ¶ 2; *see also id.* ¶ 63 (alleging that the Restrictive Covenants were agreed to "in consideration of the mutual covenants contained in the [Incentive Equity] Agreements and other good and valuable consideration, including Norman's signing bonus, salary, raise, [and] access to Payscale's confidential information").  As our case law makes clear, new consideration supporting restrictive covenants "may include a beneficial change in an employee's status, like a bonus or promotion."  *Doorly*, 2025 WL 736624, at *3. Defendants point out, however, that the Incentive Equity Agreements were executed months after Norman's respective hiring and promotion.  Norman was hired on November 29, 2021, but the First Incentive Equity Agreement was executed more than three months later, on March 14, 2022.  Similarly, Norman was promoted on February 26, 2023, but the Second Incentive Equity Agreement was signed more than five months later, on August 14, 2023.

[5] *Compare, e.g.*, *Kan–Di–Ki, LLC v. Suer*, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015) (concluding that a non-compete restricting competition for five years in twenty-three states was enforceable, in part, because "when [the purchaser] paid $4 million and then roughly $300,000 to acquire [the seller's] interests in two successive businesses, [the purchaser] acted reasonably and legitimately in insisting on some measure of protection from the possibility that [the seller] simply would go out and take those clients or otherwise undermine [the purchaser's] business"); *O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *3 (Del. Super. Ct. Jan. 14, 2011) (reviewing a four-year national noncompete that was negotiated after the sale of a business for a substantial price); *Tristate Courier &*

### b. The Noncompete Is Broader Than Necessary To Protect Payscale's Legitimate Business Interests.

The Noncompete is also broader than necessary to protect Payscale's legitimate business interests.

First, the overbreadth of the Noncompete's nationwide scope is compounded by the unlimited geographic scope of the Nonsolicitation Provision. It is difficult to conceive how Norman could work as a salesperson in Topco's or its subsidiaries' lines of business anywhere in the world and be certain not to run afoul of the Nonsolicitation Provision's broad prohibition on soliciting even prospective clients, given the difficulty in knowing who those unnamed prospective clients might be. The practical effect is that Norman is restrained from working not only nationwide, but worldwide. An international scope exceeds Payscale's legitimate economic interests, as Payscale provides "services to customers nationwide"—not worldwide.[6] Am. Compl. ¶ 15. While "a noncompete's geographic scope need not perfectly

---

*Carriage, Inc. v. Berryman*, 2004 WL 835886, at \*1–2, \*10, \*13 (Del. Ch. Apr. 15, 2004) (reviewing a noncompete entered into in connection with a sale of stock for $150,000 and observing, "[b]ecause the Covenant is part of a contract for the sale of stock, this inquiry is less searching than if the Covenant had been contained in an employment contract"); *Faw, Casson & Co.*, 375 A.2d at 465 (explaining that noncompetes "are subject to somewhat greater scrutiny when contained in an employment contract as opposed to contracts for the sale of a business").

[6] Notably, while the Noncompete applies nationally (and arguably internationally), Norman was responsible only for Enterprise customers in the West region. Am. Compl. ¶¶ 48, 59.

match the employer's footprint at the time of contracting, at least in the context of a sale of the business[,] . . . the employer must still have a legitimate business interest in the protected area." *Cleveland Integrity Servs. v. Byers*, 2025 WL 658369, at *10–11 (Del. Ch. Feb. 28, 2025). Here, Payscale does not. *See id.* (finding "a geographic scope prohibiting competition anywhere in North America" was "facially broader than necessary to protect Plaintiff's U.S. business interests"); *Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 WL 2544236, at *4 (Del. Ch. Mar. 16, 2023) (explaining that "incongruity between the [global] geographic scope" of a noncompete and the plaintiff's nationwide business "leads me to conclude the non-compete is unreasonably broad and unenforceable").

Second, although Payscale argues that the Restrictive Covenants are intended to protect Payscale's business, the Noncompete applies more broadly to Topco and all of its unnamed subsidiaries. The Noncompete does not describe the lines of business in which any of those entities operate, rendering the provision unreasonably vague. *See, e.g.*, *Hub Gp., Inc.*, 2024 WL 3453863, at *9 (finding a noncompete overbroad where the plaintiff "could not articulate or describe" the business conducted by all the entities included under the definition of "Competing Business"); *Centurion Serv. Gp.*, 2023 WL 5624156, at *4 (finding a noncompete overbroad because it "fail[ed] to define precisely what [the company's] 'business' is"); *FP UC Hldgs.*, 2020 WL 1492783, at *7 (same). The Noncompete also

15

prohibits Norman from working in the same line of business as Topco (managing investments), even though Norman is not alleged to have any special knowledge of Topco's business that it conceivably could have an interest in protecting.

Finally, two limitations to the definition of "Competitive Activity" do not save the Noncompete. The Incentive Equity Agreements define "Competitive Activity" to permit work in a position that "(i) would not involve any level of strategic, advisory, technical, creative, or sales activity or (ii) is exclusively in connection with an independent business line of such entity that is wholly unrelated to the business operated by the Partnership Group and the Confidential Information." First Agt. § 9; Second Agt. § 9. Those carve-outs do little to limit the reach of the Noncompete. "[S]trategic, advisory, technical, creative, or sales activity" is so broad as to encompass virtually any position. And, as noted above, the Incentive Equity Agreements do not define the business lines "operated by the Partnership Group." First Agt. § 9; Second Agt. § 9. Even with these limiting clauses, the Noncompete prohibits activity beyond Payscale's legitimate economic interests, rendering it unenforceable.

### c. The Court Will Not Blue Pencil The Noncompete.

The Court will not blue pencil the Noncompete. "Delaware courts have the *discretionary* power to blue pencil overbroad restrictive covenants to align a company's legitimate interests and an individual's right to be free from unreasonable

16

restrictions on their livelihood." *Sunder Energy, LLC v. Jackson*, 2024 WL 5052887, at *8 (Del. Dec. 10, 2024) (emphasis added). "[T]he court's decision to exercise that equitable power should be based on the covenants themselves and the circumstances surrounding their adoption . . . ." *Id.* at *12. For example, "Delaware courts have exercised their discretion to blue pencil restrictive covenants under circumstances that indicate an equality of bargaining power between the parties, such as where the language of the covenants was specifically negotiated, valuable consideration was exchanged for the restriction, or in the context of the sale of a business." *Id.* at *8.

Even drawing all reasonable inferences in Payscale's favor,[7] the Amended Complaint does not allege any facts that conceivably could warrant blue penciling. The Amended Complaint does not allege that Norman entered into the Incentive Equity Agreements in connection with the sale of a business, but through her employment. Nor does the Amended Complaint allege facts suggesting that the parties enjoyed equal bargaining power, or even that the Restrictive Covenants were

---

[7] Payscale argues that the availability of blue penciling raises fact issues. AB at 34. "Although the Supreme Court's affirmance [in *Sunder Energy, LLC*] was based on a developed record after trial, I do not read *Sunder* to require a trial on the availability of blue penciling where, as here, a noncompete is facially invalid and the [alleged] facts do not support such a remedy." *See Weil Hldgs. II, LLC v. Alexander*, 2025 WL 689191, at *7 n.7 (Del. Ch. Mar. 4, 2025).

negotiated. Accordingly, the Court will not exercise its discretion to blue pencil the Noncompete.

### 2. The Amended Complaint Fails To Adequately Allege A Breach Of The Nonsolicitation Or Confidentiality Provision.

The Amended Complaint fails to adequately allege that Norman has breached the Nonsolicitation Provision or the Confidentiality Provision. The Amended Complaint alleges "on information and belief" that, through her work for BetterComp, "Norman breached . . . Section 8(b)(ii), which prohibits the solicitation of Payscale's customers or prospective customers," and "is using Payscale's confidential information to solicit prospective customers to enter into contracts with BetterComp instead of with Payscale." Am. Compl. ¶¶ 96, 132. These conclusory allegations, unsupported by any additional pled facts, fail to state a claim for breach of either provision. *See Intertek Testing Servs. NA, Inc.*, 2023 WL 2544236, at \*5–6 (dismissing a claim for breach of contract where the complaint only "assert[ed]—without supporting facts—that [the defendant] 'violat[ed] his various duties under'" a stock purchase agreement's nonsolicitation provision); *Fitzgerald v. Cantor*, 1999 WL 66526, at \*1 (Del. Ch. Jan. 14, 1999) ("Conclusory allegations . . . are not accepted as true without specific supporting factual allegations.").

\*        \*        \*

18

To summarize, the Noncompete is unenforceable, and the Amended Complaint fails to state a claim for breach of the Nonsolicitation Provision or the Confidentiality Provision. Count I is dismissed.

## B. Count II Is Dismissed.

In Count II of the Amended Complaint, Payscale alleges a claim against BetterComp for tortious interference with contractual relations.

To state a claim for tortious interference with contract, a plaintiff must allege "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (emphasis omitted) (citation omitted).

The parties' briefing concedes that Count II turns on the enforceability of a contract, and therefore rises or falls on Count I. *See* OB at 37; AB at 35. Because Count I dismissed, Count II is also dismissed.

## C. Count III Is Dismissed.

In Count III of the Amended Complaint, Payscale alleges a claim against Norman and BetterComp for tortious interference with prospective business relations.

 To state a claim for tortious interference with prospective business relations, a plaintiff must allege "(1) a reasonable probability of a business opportunity;

19

(2) intentional interference by a defendant with that opportunity; (3) proximate causation; and (4) damages." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 607–08 (Del. Ch. 2012). When evaluating the sufficiency of such allegations, "[o]ur courts reject 'vague statements about unknown customers,' allegations of 'a nebulous, unascertainable class of business relationships,' or speculative prospects." *Preston Hollow Cap. LLC v. Nuveen LLC*, 2020 WL 1814756, at *12 (Del. Ch. Apr. 9, 2020) (citations omitted). "Instead, to succeed, [a plaintiff] must . . . . 'identify a *specific* party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant.'" *Id.* (emphasis added) (citation omitted).

Count III fails to state a claim because the Amended Complaint does not plead facts supporting an inference of either a reasonable probability of any specific business opportunity, or intentional interference with any such opportunity. The Amended Complaint alleges "on information and belief" that "Norman and BetterComp knew and know of Payscale's prospective and potential contractual and business relations with its existing customers and prospective customers" and "have interfered with and continue to interfere with Payscale's prospective business relations without justification or privilege," but fails to plead any facts in support. Am. Compl. ¶¶ 161–62. "[C]onclusory statements that Defendants thwarted Plaintiffs' business opportunities, . . . are insufficient to survive at the motion to dismiss stage." *Glob. Discovery Biosciences Corp. v. Harrington*, 2023 WL

20

8295946, at *7–8 (Del. Ch. Dec. 1, 2023) (finding that a plaintiff "fail[ed] to plead a *prima facie* claim for tortious interference with prospective business relations" where the complaint did not "assert potential contracts or opportunities that Defendants interfered with").

The Amended Complaint also alleges that "BetterComp has been deliberately targeting Payscale's customers by recruiting Payscale's employees," but fails to allege that BetterComp acted unfairly when competing for employees. Am. Compl. ¶ 135. A claim for tortious interference with prospective business relations "is unusual, in that its application, even if the[] elements are met, is circumscribed by consideration of competing rights. Thus, the elements of the tort must be considered in light of a defendant's privilege to compete in a lawful manner." *Kuramo Cap. Mgmt., LLC v. Seruma*, 2024 WL 1888216, at *33 (Del. Ch. Apr. 30, 2024) (quoting *Preston Hollow Cap. LLC*, 2020 WL 1814756, at *12). A defendant has a privilege to compete if "(a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other." *Id.* at *34 (quotation omitted). The only "wrongful" conduct adequately alleged is violation of a Noncompete that the Court has found unenforceable. Count III therefore fails to state a claim.

21

## III. CONCLUSION

For the reasons explained above, the Motion to Dismiss is GRANTED and the Amended Complaint is DISMISSED.